NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-516                                          Appeals Court

          WELLS FARGO BANK, N.A.  vs.  JASON A. SUTTON.


                       No. 22-P-516.

     Hampden.     May 12, 2023. - August 23, 2023.

          Present:  Massing, Ditkoff, & Singh, JJ.


Mortgage, Foreclosure.  Real Property, Mortgage.  Notice,
     Foreclosure of mortgage.  Veteran.  Practice, Civil, Notice
     of appeal.  Clerk of Court.  Housing Court.



     Summary process. Complaint filed in the Western Division of
the Housing Court Department on July 5, 2018.

     A motion for summary judgment was heard by Dina E. Fein,
J., and the case was also heard by her.

     Sean R. Higgins (Brandon R. Dillman also present) for the
plaintiff.
     Jason A Sutton, pro se, submitted a brief.


     DITKOFF, J.  The homeowner, Jason A. Sutton, appeals from a

judgment after a Housing Court bench trial awarding the

plaintiff, Wells Fargo Bank, N.A. (bank), possession after a

foreclosure.[1]  Based on its interpretation of the Massachusetts COVID-19 pandemic eviction moratorium, the Housing Court clerk's office refused to docket the homeowner's timely notice of appeal.  We conclude that the clerk's office should have accepted the homeowner's notice of appeal and docketed it, and that the timely notice of appeal grants us appellate jurisdiction despite the clerk's office's refusal to accept it.  Further concluding that the bank complied with Federal regulations governing loans guaranteed by the United States Department of Veterans Affairs (VA), see 38 C.F.R. § 36.4350(g)(1) (2018), by making reasonable efforts to arrange a face-to-face meeting with the homeowner before foreclosing on the property, we affirm.

1.  Background.  a.  Loan proceedings.  In July 2011, the homeowner obtained a mortgage loan from Residential Mortgage Services, Inc., in the amount of $237,900 to finance the purchase of a home in East Longmeadow (the property).  The loan was guaranteed by the VA.  On October 9, 2015, the mortgage was assigned to the bank.  Shortly thereafter, the homeowner defaulted.  On February 15, 2016, the bank sent the homeowner a

---

[1] The homeowner was not present at oral argument, despite having repeatedly been provided with notice by phone and e-mail. Counsel for the bank represented that he had repeatedly tried to contact the homeowner by phone and e-mail as well but had received no response.

letter informing him of his right to cure the default and his right "to request a modification of [his] mortgage." Because the loan was guaranteed by the VA, the bank was required to comply with the VA's regulations requiring reasonable efforts to avoid foreclosure, pursuant to 38 C.F.R. § 36.4350, before it could initiate foreclosure proceedings.

On November 30, 2017, the homeowner called the bank to discuss loan assistance options. The homeowner explained that he had fallen behind on payments after the death of his wife. The bank representative informed the homeowner that the bank had "several options available" to help him cure the default, including a loan modification program, a repayment program, and a forbearance option. After the representative explained these options, the homeowner asked if he could pay $15,000 up front, "and then do the repayment option over the next couple months?" The representative responded, "that's definitely a possibility." The representative then asked the homeowner if he could pay $3,000 per month, to which the homeowner replied that "[he] could for the next couple months." The homeowner stated, "Maybe I can try for a loan modification first and then if I have to, do the payment."

The representative proceeded to ask the homeowner various questions regarding his financial circumstances. The representative asked about the homeowner's employment status and

learned that, although the homeowner was currently unemployed, he "plan[ned] on getting back into the workplace" at the start of the new year. Next, the representative inquired into the homeowner's income sources, which included social security payments, VA disability payments, and a military annuity. In addition, the representative confirmed the homeowner's contact information, including his mailing address, telephone number, and e-mail address.

The representative informed the homeowner that he would be sending the homeowner an application form and requesting certain documents, which the homeowner would then need to return so that the bank could conduct a formal review and modify his loan. At the end of the call the representative stated, "Throughout this process, we will need to have communication rather frequently, so look out for my phone and if I don't reach you, I will leave you a voicemail, so go ahead and check for those." That same day, the bank sent the homeowner a letter informing him that a payment of $23,712.52 would be sufficient to reinstate his mortgage (even without modification).

On December 1, 2017, the representative sent the homeowner a packet containing the loan modification application, a step-by-step guide "that takes [the applicant] through the process," and an income documentation guide. The cover letter was signed by the representative who had spoken with the homeowner on the

telephone, and it contained his e-mail address, telephone number, and extension.

The homeowner testified that he mailed the completed application with four months of monthly bank statements to the bank. At trial, the judge orally stated that she credited this testimony, although no such finding appears in the judge's written findings. In any event, there is no record of the bank having actually received the documents.

On five different occasions over the course of December, the bank attempted to establish contact with the homeowner regarding his request for mortgage assistance. On December 6, 8, and 13, 2017, the bank[2] called the homeowner to inform him that it had not received the necessary documentation, each time leaving a voice message. On December 15, the representative who had spoken with the homeowner sent an e-mail to the homeowner, stating, "we have not received any of the required documents needed to begin reviewing your home assistance application." The e-mail listed three different methods by which the homeowner could submit the documents. Again, the representative provided his e-mail address, telephone number, and extension. On December 20, the bank left another voice message. On January

---

[2] The record does not reflect whether these phone calls were made by the same bank representative who spoke to the homeowner on November 30, 2017. Who made the calls on behalf of the bank is not material to our decision.

10, 2018, the bank representative sent an e-mail to the homeowner to inform him that it was "no longer moving forward with [his] request" for mortgage assistance.

On February 15, 2018, the bank (through counsel) sent the homeowner a letter informing him of the bank's intent to foreclose by sale on or after March 19, 2018.  On March 19, 2018, the bank foreclosed on the property.  On April 23, 2018, the bank transferred the property to the VA in exchange for $218,983.20, presumably the amount required for the VA to fulfill its guarantor obligation, see 38 U.S.C. § 3732(c)(5)(A).

b.  Procedural history.  On June 19, 2018, the VA served the homeowner with a notice to quit.  On June 28, 2018, the VA served the homeowner with a summary process summons and complaint.  The defendant timely answered, and the VA moved for summary judgment on the issue of possession.  After a hearing, a judge denied the motion.  On July 17, 2019, the parties proceeded to trial.

At trial, the sole issue was whether the bank had complied with the VA regulations, and specifically whether the bank was required to conduct a face-to-face meeting with the homeowner before it foreclosed on the property.  The evidence at the first day of trial established the bank's December 2017 and January 2018 attempts to contact the homeowner, but the bank employee who testified was unable to provide information concerning the

November 30, 2017, telephone call.  The homeowner testified that, during the call, he repeatedly asked to pay off the deficiency, but the bank insisted that he modify the loan instead.[3]

Faced with this inconsistency, the judge ordered "additional testimony and evidence as to the telephone conversation on November 30, 2017, the amount in default at that time, and the [homeowner's] ability to cure the default at that time."  The VA then transferred the property back to the bank, and the bank was substituted as the plaintiff by agreement.

At the second day of trial, the bank provided a recording of the November 30 telephone call, as well as several other documents.  The homeowner, for his part, testified that he had at least $26,000 in cash at the time of the November 30 telephone call.

On April 7, 2020, the judge awarded the bank judgment for possession because it had "established its prima facie case and satisfied the requirements of 38 C.F.R. § 36.4350 without the necessity of a face-to-face meeting."  The judge found that,

---

[3] Although the homeowner's version proved to be inaccurate, nobody suggests that the homeowner was lying.  The homeowner specifically informed the judge that he "was pretty shaken" during the phone call and it "was a pretty emotional phone call."  It is hardly unusual for a person in the homeowner's circumstances to have imperfect recall of a telephone call of this nature.

after the November 30 call, "[the bank] sent multiple communications indicating that it had not received the necessary information and would proceed to foreclosure" and that it had "attempted to establish contact through phone calls and emails, to which [the homeowner] did not respond." The judge determined that "[the bank's] attempts to continue communication with [the homeowner] after the initial contact on November 30, 2017 constituted a reasonable effort to establish a realistic and mutually satisfactory loss mitigation plan." Judgment entered the same day.

Nine days later, on Thursday, April 16, 2020, the homeowner filed a timely notice of appeal from the judgment. On April 20, 2020, the Legislature passed an emergency act creating an eviction moratorium in response to the COVID-19 pandemic. St. 2020, c. 65. The Housing Court's clerk's office then rejected the notice of appeal and refused to docket it. When the homeowner's counsel inquired about the reason for this, the clerk's office stated that it had been "instructed to reject all items regarding" summary process actions because of the eviction moratorium. The clerk-magistrate opined that, "[i]n my reading, nothing will prejudice your client from pursuing an appeal once the moratorium is lifted."

The eviction moratorium ended on Saturday, October 17, 2020. See Expiration of Moratorium on Evictions and

Foreclosures, https://www.mass.gov/info-details/expiration-of-
moratorium-on-evictions-and-foreclosures [https://perma.cc/4XV7-
3862]. On October 20, 2020, the homeowner refiled his notice of
appeal, attaching a copy of the correspondence with the clerk's
office. This appeal followed.

2. Appellate jurisdiction. "A timely notice of appeal is
a jurisdictional prerequisite to our authority to consider any
matter on appeal." DeLucia v. Kfoury, 93 Mass. App. Ct. 166,
170 (2018). Although the bank does not challenge the timeliness
of the notice of appeal, we have the duty to consider sua sponte
whether we have jurisdiction. See Federal Nat'l Mtge. Ass'n v.
Gordon, 91 Mass. App. Ct. 527, 531 (2017). Accord Krimkowitz v.
Aliev, 102 Mass. App. Ct. 46, 48-50 (2022).

"[A] party seeking to appeal from a judgment on a summary
process action" must file a notice of appeal within ten days of
the entry of final judgment. Graycor Constr. Co. Inc. v.
Pacific Theatres Exhibition Corp., 490 Mass. 636, 646 n.13
(2022), citing G. L. c. 239, § 5. See DeLucia, supra at 169
("appeal period, set by statute, cannot be enlarged").

Here, we have the odd circumstances of a notice of appeal
that was filed in a timely manner but was rejected by the
clerk's office. "In the absence of an order from a judge,
[clerks] may not refuse to accept a notice of appeal, even if
they believe that no appeal is available or that the notice is

untimely or otherwise defective."  Loftfield v. Ferreira, 440

Mass. 1012, 1012 (2003), quoting Gorod v. Tabachnick, 428 Mass.

1001, 1001, cert. denied, 525 U.S. 1003 (1998).  See Farzana K.

v. Indiana Dep't of Educ., 473 F.3d 703, 708 (7th Cir. 2007)

(clerk has limited "power to reject documents tendered for

filing").  Cf. Jahm v. Mall at Liberty Tree, LLC, 487 Mass.

1009, 1010 (2021) (judge may strike notice of appeal but order

striking notice of appeal always appealable).

The clerk's office should have accepted the homeowner's

timely notice of appeal.  Nothing in St. 2020, c. 65, provided

authority for a clerk's office to refuse to accept a notice of

appeal.  That law required that, in a "non-essential eviction"

case for a residence or small business,[4] the court not "accept

for filing a writ, summons or complaint."  St. 2020, c. 65,

§ 3 (b) (i).[5]  Although we recognize the difficulty imposed on a

clerk's office by a legislative mandate to reject a filing

(rather than merely making that filing inoperative), this

---

[4] A "non-essential eviction" was an eviction that did not
involve issues of criminal activity or lease violations "that
may impact the health or safety of other residents, health care
workers, emergency personnel, persons lawfully on the subject
property or the general public."  St. 2020, c. 65, § 1.

[5] The law also prohibited, in a "non-essential eviction,"
scheduling a summary process trial, entering a judgment for
possession for the plaintiff, issuing an execution for
possession, or denying a defendant's request to continue
proceedings or to stay an execution.  St. 2020, c. 65, § 3 (b).

statute did not prohibit a court from accepting a notice of appeal and should not have been read as broader than it was written.

The law also provided the following:

"A deadline or time period for action by a party to a non-essential eviction for a residential dwelling unit or small business premises unit, whether such deadline or time period was established before or after the effective date of this act, including, but not limited to, a date to answer a complaint, appeal a judgment or levy upon an execution for possession or a money judgment, shall be tolled."

St. 2020, c. 65, § 3 (c).  It is not evident that this provision had any applicability to the instant case, where the notice of appeal was filed (though not docketed) prior to the enactment of the moratorium, especially where the time to appeal had run before the enactment of the moratorium.

Even if the deadline had been tolled, the fact that a deadline for filing an appeal was tolled simply meant that a notice of appeal could be filed until (at least) the end of the tolling period; it did not mean that a notice of appeal could not be filed until after the tolling period ended.  It was inappropriate for the clerk's office to impose upon summary process defendants the burden of monitoring legal developments so as to determine when the moratorium ended and file a notice of appeal within ten days of the moratorium's end -- which the homeowner's legal aid attorney, exhibiting exemplary diligence,

did in this case.  It was especially inappropriate here, where the duration of the moratorium was indefinite.  See St. 2020, c. 65, § 6 ("sections 3 [and 4] shall expire 120 days after the effective date of this act or 45 days after the COVID-19 emergency declaration has been lifted, whichever is sooner; provided, however, that the governor may postpone such expiration in increments of not more than 90 days").

Instead, the clerk's office should have accepted the notice of appeal and docketed it as soon as possible (which understandably could have been delayed because of the staffing challenges occasioned by the pandemic).  See Skandha v. Clerk of the Superior Court for Civil Business in Suffolk County, 472 Mass. 1017, 1019 (2015), quoting Gorod, 428 Mass. at 1001 ("Clerks . . . are ministerial officers of the court when it comes to receiving and filing papers").  Accordingly, because the original notice was timely filed, we have appellate jurisdiction to review the merits.  See McNeff v. Cerretani, 489 Mass. 1024, 1025-1026 (2022).

3.  Bank's compliance with 38 C.F.R. § 36.4350(g).  "When reviewing the decision of a trial judge in a summary process action, 'we accept [the judge's] findings of fact as true unless they are clearly erroneous,' but 'we scrutinize without deference the legal standard which the judge applied to the facts.'"  Cambridge St. Realty, LLC v. Stewart, 481 Mass. 121,

123 (2018), quoting Andover Hous. Auth. v. Shkolnik, 443 Mass. 300, 306 (2005). We owe no deference to the Housing Court's interpretation of 38 C.F.R. § 36.4350(g) because "[t]he interpretation of a regulation is a question of law which we review de novo." Commonwealth v. Aldana, 477 Mass. 790, 801 n.22 (2017), quoting Commonwealth v. Hourican, 85 Mass. App. Ct. 408, 410 (2014).

Federal regulations impose various requirements for loans guaranteed by the VA. In particular, "38 C.F.R. § 36.4350(g) . . . governs collection actions by the lender." Wells Fargo Bank, N.A. v. LaTouche, 340 Ga. App. 515, 518 (2017) (LaTouche). These requirements aim to ensure that veterans "receive every reasonable opportunity to bring [a] loan current and to retain [a] home." 38 C.F.R. § 36.4350(g)(1)(iv)(B)(4). Specifically, holders of such loans "must make a reasonable effort to establish . . . (1) The reason for the default and whether the reason is a temporary or permanent condition; (2) The present income and employment of the borrower(s); (3) The current monthly expenses of the borrower(s) including household and debt obligations; (4) The current mailing address and telephone number of the borrower(s); and (5) A realistic and mutually satisfactory arrangement for curing the default." 38 C.F.R. § 36.4350(h).

The regulations require that, in attempting to obtain this information, a lender must make an effort "to establish contact with the borrower(s) by telephone."  38 C.F.R. § 36.4350(g)(1)(i).  "In the event the holder has not established contact with the borrower(s) and has not determined the financial circumstances of the borrower(s) or established a reason for the default or obtained agreement to a repayment plan from the borrower(s), then a face-to-face interview with the borrower(s) or a reasonable effort to arrange such a meeting is required."  38 C.F.R. § 36.4350(g)(1)(iii).  Accord LaTouche, 340 Ga. App. at 519.

Here, we need not determine the exact contours of what information a bank needs to receive before being excused from the duty of seeking a face-to-face interview, as the findings of the trial judge establish that the bank made "a reasonable effort" to meet with the homeowner.  38 C.F.R. § 36.4350(g)(1)(iii).  Cf. Wells Fargo Bank, N.A. v. Sowell, 2012-Ohio-2987, ¶ 13 (10th Dist.) (no face-to-face meeting was required where there was "extensive contact and correspondence between Wells Fargo and the [homeowners] over the lengthy period preceding actual foreclosure upon the note").  After the homeowner defaulted, the bank sent the homeowner a letter informing him that he had a right to cure the default and that he was eligible to modify his mortgage.  On November 30, 2017,

the bank engaged in a lengthy telephone conversation with the homeowner regarding his request for mortgage assistance.  During that call the bank obtained a considerable amount of financial information from the homeowner.  See Bulmer v. MidFirst Bank, FSA, 59 F. Supp. 3d 271, 280 (D. Mass. 2014), quoting 38 C.F.R. § 36.4350(h) ("The holder shall solicit sufficient information to properly evaluate the prospects for curing the default").

After the bank sent the homeowner a loan modification application, it contacted the homeowner on five different occasions by telephone and e-mail stating that it had not received the required documents.  See Secretary of Veterans Affairs v. Leonhardt, 2015-Ohio-931, 29 N.E.3d 1, ¶ 88 (3d Dist.)  ("the record reflects extensive contact and correspondence between the VA's loan servicers . . . and [the homeowner]" prior to foreclosure).  Despite the bank's continued efforts, the homeowner never responded.  There was, simply, no reasonable way the bank could proceed to schedule a face-to-face meeting in light of the homeowner's complete silence in response to the bank's many efforts to contact him after the initial telephone conversation.  Accordingly, under these circumstances, a face-to-face meeting prior to foreclosure "was not required." LaTouche, 340 Ga. App. at 520.

                              Judgment affirmed.